## UNITED STATES DISTRICT COURT

## DISTRICT OF RHODE ISLAND

**LAURA PEREZ**

| 

    **Plaintiff**

       **Vs.**                    **Civil Action No.**

**FEDERAL HOUSING FINANCE  AGENCY**
**FEDERAL HOME LOAN  MORTGAGE CORPORATION**
**WILMINGTON SAVINS FUND SOCIETY, FSB,**
**D/B/A CHRISTIANA TRUST NOT INDIVIDUALLY**
**BUT AS TRUSTEE FOR PRETIUM  MORTGAGE**
**ACQUISITION TRUST**

    **Defendants**

## COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES

### *Introduction*

1.    Plaintiff, Laura Perez, is the owner of real property located at  16 Babcock Street, Providence, Rhode Island ("Property"), which is her primary residence.  Through this action Plaintiff challenges the lawfulness of the various threatened attempted foreclosure sales of her residence which were scheduled on March 25, 2015, June 17, 2015, September 20, 2015, and January 5, 2016 by certain Defendants: The Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"), an agency or instrumentality of the federal government; Freddie Mac's conservator and regulator, the Federal Housing Finance Agency ("FHFA"), a federal agency, Wells Fargo Bank, N.A. ( "Wells Fargo") acting as an agent of Freddie Mac and FHFA. On or February 19, 2016 FHFA and Freddie Mac sold Plaintiff's mortgage along with 2716 other loans to Pretium Mortgage Credit Partners I Loan Acquisition, LP and Rushmore

Loan Management Services, LLC. At no time did Wells Fargo Bank, N.A. have any interest in the note or the mortgage executed by Plaintiff.  Subsequently an assignment of mortgage was executed by Wells Fargo Bank, N.A. to Defendant Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust as trustee for Pretium Mortgage Acquisition Trust.   This assignment was void because Wells Fargo Bank, N.A. never had an interest in this mortgage. Plaintiff seeks declaratory relief, injunctive relief, damages, and other relief from this Court, because Defendants Freddie Mac and FHFA have a policy to deprive homeowners like the Plaintiff of their interest in their homes by conducting foreclosure sales in Rhode Island without providing homeowners with adequate notice and an opportunity for a meaningful hearing, as required by the Due Process clause of the Fifth Amendment to the Constitution of the United States, and other laws. Pursuant to this policy, the Defendants are jointly seeking to deprive the Plaintiff of her interest in the Property, and cause harm to her in various other ways hereinafter stated.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action and all defendants pursuant to 28 U.S.C. § 1331, because this case arises under the Constitution and laws of the United States.

3.     Further, this Court has jurisdiction over the current action and all defendants pursuant to 12 U.S.C § 1452 (f)(2) because this case is brought against Freddie Mac.

4.     The principal events giving rise to the claims stated herein occurred in this district and venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391 (c)(2).

5.     This Court has authority to issue declaratory and injunctive relief pursuant to 28

U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. Rule 57.

## THE PARTIES

6. The Plaintiff is a citizen of the United States who resides at 16 Babcock Street, Providence, RI ("Property"). She owns said property and resides there with her elderly mother, Dominga Silvestre.

7. The Federal Housing Finance Agency ("FHFA") is an independent agency of the United States Federal Government established pursuant to 12 U.S.C. § 4511 *et seq*.

8. The Federal Home Loan Mortgage Corporation ("FHLMC" and "Freddie Mac") is a corporation organized under the laws of the United States by special charter, to serve the important governmental objectives of providing stability in the secondary mortgage market, responding appropriately to the private capital market, providing ongoing assistance to the secondary market for residential mortgages, and promoting access to mortgage credit throughout the nation by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing. See 12 U.S.C. § 1451 note.

9. Rushmore Loan Mangagement Services, LLC( "Rushmore"), is a limited liability company organized under the laws of the state of Delaware with a principal place of business in the state of California.

10. Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust as trustee for Pretium Mortgage Acquisition Trust is a securitized trust, which has an address of 500 Delaware Avenue, 11th Floor, Wilmington, Delaware, 19801.

11. Wells Fargo Bank, N.A. is a national bank with a principal office in North Carolina.

## GENERAL FACTUAL ALLEGATIONS

### *The Conservatorship of FHFA over Freddie Mac*

12.     In accordance with the Housing and Economic Recovery Act of 2008 ("HERA"), the

federal government established FHFA as a federal agency to supervise and regulate

Freddie Mac and affiliated entities, the Federal National Mortgage Association

("Freddie Mac") and affiliated entities, and any Federal Home Loan Bank. See 12

U.S.C. §§ 4502 (20), 4511(b)(2).

13.     Among the powers the federal government granted to the FHFA pursuant to HERA

was the power of its Director to place Freddie Mac into conservatorship under the

FHFA and the power of the FHFA to operate and control all of Freddie Mac's

operations as its conservator.

14.     On or about September 7, 2008, the Director of the FHFA placed Freddie Mac under

the conservatorship of the FHFA. See Statement of FHFA Director James B.

Lockhart, http://www.treasury.gov/press-center/press-

releases/Documents/fhfa_statement_090708hp1128.pdf , accessed May 12, 2014.

15.     In January 2010, the Congressional Budget Office (hereafter "CBO") concluded that

the actions taken by FHFA to place Freddie Mac under conservatorship effectively

made Freddie Mac a government entity, based on the federal government's control

and ownership of Freddie Mac. Budgetary Treatment of Freddie Mac and Freddie

Mac, (Congressional Budget Office Background Paper, 2010), available at

https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/01-13-

fanniefreddie.pdf . ("In the judgment of the Congressional Budget Office (CBO), those actions make Freddie Mac and Freddie Mac part of the government and imply that their operations should be reflected in the federal budget"). Under the CBO's accounting, "the mortgages owned or guaranteed by Freddie Mac and Freddie Mac were treated as loans and guarantees of the federal government." Id. at page 7.

16. In 2013, the CBO again concluded, "the federal government is now the effective owner of [Freddie Mac], any gain or loss arising from a change in the way the distressed mortgages are handled by [Freddie Mac] would ultimately accrue to taxpayers." See Options for Principal Forgiveness in Mortgages Involving Freddie Mac and Freddie Mac (Congressional Budget Office, Mitchell Remy & Damien Moore, Working Paper No. 2013-02) available at

https://www.cbo.gov/sites/default/files/113th-congress-2013-2014/workingpaper/44114_WorkingPaper-OptionsPrincipalForgivenesl_1.pdf  at page 1.

17. As conservator, FHFA controls all of the rights, titles, powers and privileges of the shareholders and board of directors of Freddie Mac. See Federal Home Loan Mortgage Corporation, Annual Report, Form 10-K, for the fiscal year ended December 31, 2015, www.freddiemac.com/investors/er/pdf/10k_021816.pdf , relevant portions, at pages 157-158, 177, 216.  Because FHFA as conservator has succeeded to the rights of all shareholders, the FHFA elects the directors, not shareholders.

18. As conservator, FHFA determines the size of Freddie Mac's Board of Directors and the scope of its authority. Since the start of the conservatorship and as recently as

February 12, 2016, FHFA elected all of the directors and the Chief Executive Officer of Freddie Mac.  FHFA delegated certain authority to the Board of Directors, while retaining certain significant authorities for itself.  FHFA may amend or withdraw the delegation of authority at any time.

19.     According to Freddie Mac, "FHFA controls our business activities." FHFA determines the strategic direction of Freddie Mac, defines its business objectives, and mandates activities, even though the objectives and activities FHFA mandates are costly to implement, have adversely affected Freddie Mac's financial results, and reduces Freddie Mac's profitability.  Freddie Mac's management decisions "are subject to review and/or approval by FHFA and management frequently receives direction from FHFA on various matters involving day-to-day operations."

20.     Freddie Mac's directors serve on behalf of, and exercise their authority as directed by, FHFA.  As a result of the conservatorship, Freddie Mac is being managed to serve a public mission, which may negatively impact Freddie Mac's business and profitability.  Freddie Mac is not managed to maximize shareholder returns.

21.     FHFA, as both conservator and regulator, and the United States Treasury, pursuant to the senior preferred stock purchase agreement, prohibits Freddie Mac from paying any dividends to common shareholders.

22.     According to the FHFA's September 7, 2008 explanation of the conservatorship, there is "no exact time frame that can be given as to when this conservatorship may end." FHFA's conservatorship of Freddie Mac will end, according to said explanation, when the Director of FHFA issues an order terminating the conservatorship, after the Director determines that FHFA's "plan to restore the

Company to a safe and solvent condition has been completed successfully." See

FHFA, Questions and Answers on Conservatorship, (Sept. 7, 2008), available at

http://www.treasury.gov/press-center/press-

releases/Documents/fhfa_consrv_faq_090708hp1128.pdf. ("Our future is uncertain,

and the conservatorship has no specified termination date. We do not know what

changes may occur to our business model during or following conservatorship,

including whether we will continue to exist. We are not aware of any current plans of

our Conservator to significantly change our business model or capital structure in the

near term. Our future structure and role will be determined by the Administration and

Congress, and it is possible and perhaps likely that there will be significant changes

beyond the near term. We have no ability to predict the outcome of these

deliberations."). ("The conservatorship is indefinite in terms of duration").

23.     As a result of FHFA's conservatorship of Freddie Mac, since September 6, 2008, and

continuing now and for the foreseeable future, FHFA directly controls and operates

Freddie Mac with all the powers of the shareholders, directors, and officers of Freddie

Mac, owns title to all the assets of Freddie Mac, and has broad powers over all

business of Freddie Mac.

24.     HERA does contain a provision automatically terminating FHFA's conservatorship of

Freddie Mac, namely if FHFA's director appoints FHFA as receiver of Freddie Mac.

*See* 12 U.S.C. 4617(a)(4)(D).  However, FHFA's control over Freddie Mac will not

be terminated upon its being appointed as receiver.  There is no other law, regulation,

policy or directive that provides either a date or specifies conditions by which

FHFA's control over Freddie Mac will terminate.

25.     Even if the conservatorship were terminated by means other than the appointment of
        FHFA as receiver of Freddie Mac, Freddie Mac will remain subject to the control of
        the United States Treasury through the senior preferred stock purchase agreement,
        senior preferred stock, and warrant to purchase common stock. ("The purchase
        agreement has an indefinite term and can terminate only in limited circumstances,
        which do not include the end of the conservatorship") and page 157 ("The Treasury
        Agreements and the senior preferred stock do not contain any provisions causing
        them to terminate or cease to exist upon the termination of conservatorship").

26.     On or about September 7, 2008, as restated on or about September 26, 2008, Freddie
        Mac entered into a senior preferred stock purchase agreement, as amended, with the
        United States Treasury. Pursuant to the senior preferred stock purchase agreement,
        Freddie Mac transferred to the United States Treasury 1,000,000 shares of preferred
        stock, senior in right for both dividends and liquidation to all other preferred or
        common stock of Freddie Mac, with an initial liquidation preference of $1,000.00 per
        share; a warrant to purchase 79.9% of the common stock of Freddie Mac at a nominal
        price; and certain restrictions on Freddie Mac's ability to issue new shares, declare
        dividends, or dispose of assets without the approval of the United States Treasury; in
        exchange for the commitment of the United States Treasury to extend up to $100
        billion (later amended to $200 billion) to maintain the liquidity of Freddie Mac. See
        Amended and Restated Senior Preferred Stock Purchase Agreement, dated September
        26, 2008, available at http://www.fhfa.gov/Conservatorship/Documents/Senior-
        Preferred-Stock-Agree/2008-9-
        6_BayviewPA_FannieMae_RestatedAgreement_N508.pdf.

27.     Since the conservatorship began in 2008 through the first quarter of 2012, Freddie

Mac received a total of $71.3 billion from Treasury under the senior preferred stock

purchase agreement to maintain a zero net worth. Because the senior preferred stock

had an initial liquidation preference of $1 billion, the current aggregate liquidation

preference in favor of the United States Treasury for the senior preferred stock is

$72.3 billion.

28.     The United States Treasury owns 100% of the senior preferred stock of Freddie Mac,

and holds warrants to purchase 79.9% of the common stock of Freddie Mac at a

nominal price on a fully diluted basis on the date of exercise.  ; see also Fact Sheet:

Treasury Senior Preferred Stock Purchase Agreement

http://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-

Agree/2008-8-7_BayviewPA_FactSheet_508.pdf.

29.     By virtue of the senior preferred stock purchase agreement, as amended, the United

States Treasury is entitled to receive quarterly dividends equal to the entire net worth

of Freddie Mac, which results in every dollar of future profits being paid to the

United States Treasury.  Similarly, Freddie Mac is not permitted to retain earnings,

rebuild a capital position, or pay dividends or other distributions to stockholders other

than the United States Treasury. Dividends are payable only at the direction of the

Conservator FHFA and with consent of the Treasury.

30.     Through the first quarter of 2016, Freddie Mac paid a total of $98.2 billion in

dividends to Treasury on the senior preferred stock.  However, under the terms of the

senior preferred stock purchase agreement, dividend payments do not offset prior

Treasury draws, and, therefore, the Treasury's ownership interest in Freddie Mac is not reduced by reason of the dividends.

31. Pursuant to the senior preferred stock purchase agreement, Freddie Mac is not permitted to redeem the senior preferred stock prior to the termination of the United States Treasury's funding commitment, which commitment will not terminate unless Freddie Mac is liquidated, Freddie Mac's liabilities are satisfied, or the Treasury has provided the maximum amount of funding available under its commitment to Freddie Mac.

32. The CBO considers the payments from Freddie Mac to the United States Treasury as "intragovernmental payments, which do not affect net federal outlays."

33. Because Freddie Mac was chartered by Congress to further governmental objectives related to the secondary mortgage market and national housing policies, because the federal government maintains a substantial ownership interest in Freddie Mac, because Freddie Mac is substantially funded by the federal government, because the Board of Directors of Freddie Mac is entirely appointed by FHFA, and because Freddie Mac is under the control of FHFA and/or the United States Treasury, Freddie Mac is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the federal government by the United States Constitution. See DOT v. Ass'n of Am. R.R., 135 S. Ct. 1225, 1232-1233 (U.S. 2015); Lebron v. National Railroad Passenger Corp., 513 U.S. 374 (1995).

*The Agency Relationship between FHFA and Freddie Mac and the Servicing Agent.*

34. Freddie Mac purchases mortgages that meet its underwriting standards from originators such as banks or thrifts. Freddie Mac holds these mortgages in its retained

portfolios or packages them into mortgage-backed securities that it sells to investors. See FHFA Office of Inspector General Evaluation Report, <u>FHFA's Oversight of the Servicing Alignment Initiative</u>, February 12, 2014, available at <u>http://fhfaoig.gov/Content/Files/EVL-2014-003.pdf</u>  at page 6.

35. For the mortgages that Freddie Mac purchases, Freddie Mac enters into contracts with mortgage servicers, including the "Servicing Guide" and other agreements. Under the terms of these agreements, the servicer collects mortgage payments, sets aside taxes and insurance premiums in escrow, forwards interest and principal payments to the contractually designated party, and responds to payment defaults.

36. Through the "Servicing Guide" and other agreements, Freddie Mac established certain requirements for its servicers to follow when it performs its servicing duties, which include specific instructions on mitigating losses after borrowers default and conducting foreclosures on behalf of Freddie Mac.

37. After FHFA placed Freddie Mac into conservatorship, FHFA has engaged in continuous supervision of Freddie Mac's oversight of its servicers.  See FHFA Office of Inspector General, <u>FHFA's Supervision of Freddie Mac's Controls over Mortgage Servicing Contractors</u>, March 7, 2012, available at <u>http://fhfaoig.gov/Content/Files/AUD%202012-001_0.pdf</u>  at Pages 19-20. FHFA's Office of Inspector General describes "continuous supervision" as "a wide range of ongoing activities designed to monitor and analyze [Freddie Mac's] overall business profile, including any trends or associated emerging risks."

   ***The Unconstitutional Foreclosure Policy of FHFA and Freddie Mac***

38.     In April, 2011, FHFA created the Servicer Alignment Initiative, as amended by four additional initiatives beginning in January 2012 (collectively, "SAI"), by which the FHFA directs the actions taken by Freddie Mac's mortgage servicers when servicing a delinquent mortgage loan, in order to maximize the financial benefits to Freddie Mac, and ultimately to the taxpayers.

39.     Through the SAI, the FHFA directed Freddie Mac to update its servicing guidelines by adding new standards and timelines by which servicers were to manage delinquent mortgages.

40.     In the SAI, the FHFA created a policy that requires servicers of Freddie Mac owned mortgages to follow specific state-level timelines for the processing of foreclosures from the date of referral to the attorney/trustee through the date of the foreclosure sale.

41.     In the SAI, the FHFA has directed Freddie Mac's servicers to use non-judicial foreclosure procedures when foreclosing on residential properties in Rhode Island, including the Plaintiff's Property. The foreclosure policy in the SAI requires servicers of Freddie Mac loans to foreclose on properties without a pre-deprivation hearing in violation of the Due Process Clause of the Fifth Amendment.

### The Plaintiff's interest in the Property

42.     On or about  September 2, 2005 the Plaintiff and Dominga Silvestre the owners of the Property by a Warranty Deed,  which deed is recorded with the land records of the City of  Providence on   September 6, 2006  at Book 7535 and Page 336.

43.    On or about September 2, 2005 Plaintiff  borrowed $151,800.00  from Domestic

Bank ("Domestic") ("Originating Lender"), which was evidenced by a promissory

note (the "Note") on the same date.

44.    On or about the same date, the Note was secured by a mortgage ("Mortgage") in

favor of the Originating Lender. The Mortgage was recorded on September 6, 2005,

in the land records of the  City of  Providence at Book 7535 and Page 336.  The

Plaintiff is named as a Borrower on to the Mortgage. The Mortgage is attached as

Exhibit A.

45.    On March 18, 2014, Mortgage Electronic Registration Systems, Inc. ("MERS") on

behalf of Domestic Bank claimed to assign the mortgage to Wells Fargo by an

assignment dated March 18, 2014 and recorded on March 24, 2014 in the Land

evidence records for the City of  Providence in Book 10824 Page 42.  See Exhibit B.

On December April 8, 2016, Wells Fargo by an assignment dated April 8, 2016

purported to assign the Mortgage to Wilmington, by an assignment recorded on April

8, 2016 in the land records for the  City of  Providence at Book 11450 Page 201. See

Exhibit C.

46.    Freddie Mac, the actual owner of the mortgage and note had conveyed the mortgage

and note on February 19, 2016. On April 8, 2016 Wells Fargo had no ownership

interest in the note or the mortgage and owned nothing to assign.

47.    This purported assignment did not conform to the Rhode Island statutory form for

assignments and did not indicate that the assignor conveyed the note and the

mortgage.

48. In fact, Wells Fargo as of April 8, 2016 had no relation to the note or mortgage and was not the agent of the owner of the note or the mortgage.

49. The note and mortgage had already been conveyed by Freddie Mac and Rushmore was the loan servicer.

### *The foreclosure proceedings against the Property*

50. After  March 1, 2010, as a result of  financial hardship, Plaintiff became delinquent on her mortgage payments. She fell behind and continued to make payments but never was able to cure the arrearage. She continued to make payments but her mortgage remained in default being due for December 2012.

51. On a date after  July 18, 2010, Wells Fargo mailed to the Plaintiff a letter dated July 18, 2010, which purported to be a default letter.  A copy is attached as Exhibit D.

52. This letter did not comply with paragraph 22 of the mortgage for various reasons.

53. This letter did not advise the Plaintiff that she had a right to bring a Court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.

54. Instead it stated : "If foreclosure is initiated, you have the right to argue that you did keep your promises and agreements under the Mortgage Note and Mortgage and to present any other defenses you may have".

55. This purported default letter was the only purported default letter ever mailed to the Plaintiff or her mother by Wells Fargo, Rushmore or any entity acting on their behalf.

56.   On or after April 1, 2015 Wells Fargo on behalf of Freddie Mac had referred the Plaintiff's Mortgage account to Harmon Law Offices, P.C. ("Harmon") to exercise the statutory power of sale and foreclose on the Plaintiff's home.

57.   On or after April 1, 2015, on behalf of the Defendants, Harmon sent a notice of foreclosure sale ("Notice") to the Plaintiff. In the Notice, Harmon stated its intention to sell the property described in the Mortgage, on June 17, 2015 at 11:00 AM.

58.    In the Notice, Harmon stated its intention to sell the property described in the mortgage deed.

59.    In conjunction with this Notice of Sale, Harmon, on behalf of Freddie Mac recorded a Notice of Mortgagee Sale in the Providence Land Records on April 27, 2015 inn Book 11102 Page 283.

60.    However neither Wells Fargo nor Freddie Mac nor FHFA had mailed the Plaintiff a default letter pursuant to the terms of the mortgage, prior to mailing the Notice of Sale and the recording of the Notice.

61.   On or after August  1, 2015, on behalf of the Defendants, Harmon sent a notice of foreclosure sale ("Notice") to the Plaintiff. In the Notice, Harmon stated its intention to sell the property described in the Mortgage, on September 30, 2015 at  10:00 AM.

62.    In the Notice, Harmon stated its intention to sell the property described in the mortgage deed.

63.    In conjunction with this Notice of Sale, Harmon, on behalf of Freddie Mac recorded a Notice of Mortgagee Sale in the Providence Land Records on August 12, 2015 in Book 11192 Page 12.

64.     However neither Wells Fargo nor Freddie Mac nor FHFA had mailed the Plaintiff a default letter pursuant to the terms of the mortgage, prior to mailing the Notice of Sale and the recording of the Notice.

65.     On or after  November 1, 2015, on behalf of the Defendants, Harmon sent a notice of foreclosure sale ("Notice") to the Plaintiff. In the Notice, Harmon stated its intention to sell the property described in the Mortgage, on January 5, 2016 at  9:00 AM.

66.     In the Notice, Harmon stated its intention to sell the property described in the mortgage deed.

67.     In conjunction with this Notice of Sale, Harmon, on behalf of Freddie Mac recorded a Notice of Mortgagee Sale in the Providence Land Records on November 13, 2015 in Book 11258 Page 97.

68.     However neither Wells Fargo nor Freddie Mac nor FHFA had mailed the Plaintiff a default letter pursuant to the terms of the mortgage, prior to mailing the Notice of Sale and the recording of the Notice.

69.     On or after February 1, 2015, on behalf of the Defendants, Harmon sent a notice of foreclosure sale ("Notice") to the Plaintiff. In the Notice, Harmon stated its intention to sell the property described in the Mortgage, on April 8, 2016  at  4:00 PM.

70.     In the Notice, Harmon stated its intention to sell the property described in the mortgage deed.

71.     In conjunction with this Notice of Sale, Harmon, on behalf of Freddie Mac recorded a Notice of Mortgagee Sale in the Providence Land Records on February 16, 2016 in Book 11326 Page 337.

72.   However neither Wells Fargo nor Freddie Mac nor FHFA had mailed the Plaintiff a default letter pursuant to the terms of the mortgage, prior to mailing the Notice of Sale and the recording of the Notice.

73.   Following the foreclosure policy in the SAI, neither Wells Fargo,  Freddie Mac, nor FHFA provided the Plaintiff an opportunity for an evidentiary hearing with Freddie Mac or FHFA at which the Plaintiff could have an opportunity to confront and cross-examine persons who supplied information upon which the foreclosure action is grounded; present arguments and evidence to dispute the allegations of Wells Fargo Freddie Mac, and FHFA prior to the attempted terminations of her interest in the Property; be represented by counsel during a hearing prior to the termination of her interest in the Property; and to have a neutral informal hearing officer make a determination based on applicable law and the evidence adduced at a hearing prior to the attempted termination of the Plaintiff's interest in the Property.

74.   Had the Plaintiff had an opportunity for a hearing, she could have presented evidence to challenge the foreclosure in one or more of the following ways:

a.   Whether Freddie Mac is the current holder of the Mortgage and authorized to exercise the power of sale;

b.   Whether the Defendants provided all required pre-foreclosure notices under state and federal law and the mortgage documents;

c.   Whether the Defendants sent a Notice of Default that strictly complies with Paragraph 22 of the Mortgage;

d.   Whether the Defendants complied with the provisions of R.I.G.L 34-27-3.1 for this foreclosure attempt,  and

e.   Whether the Defendants acted in good faith in their review and offers of loan
modifications.

## COUNT I – ATTEMPTS TO DEPRIVE PLAINTIFF OF HER PROPERTY WITHOUT DUE PROCESS OF LAW

75.   Plaintiff realleges and incorporates paragraphs 1-74 by reference.

76.   Pursuant to the foreclosure policy in the SAI, Wells Fargo, Freddie Mac, and FHFA
acted  jointly to deprive the Plaintiff of her ownership rights in the Property by
seeking to conduct a foreclosure sale pursuant to Rhode Island General Laws Chapter
34-27, entitled "Mortgage Foreclosure and Sale," which authorizes mortgagees to
foreclose the rights of an equitable title holder without judicial process or the
opportunity to be heard before the foreclosure sale.

77.   When used by federal government actors, such as Freddie Mac and FHFA, the
procedures of Rhode Island General Laws Chapter 34-27 do not satisfy the Due
Process Clause of the Fifth Amendment before depriving an owner of her or her
property. Specifically, Chapter 34-27 does not provide for adequate notice, an
opportunity to be heard before the deprivation of property, or the opportunity to
recover appropriate damages for an improper deprivation of property.

78.   Pursuant to the Due Process Clause of the Fifth Amendment to the United States
Constitution, Freddie Mac and FHFA, as agencies and/or instrumentalities of the
federal government, owed a higher degree of notice and hearing to Plaintiff than is
provided by Rhode Island General Laws chapter 34-27 before attempting to deprive
the Plaintiff of her property.

79.     The Plaintiff had a significant property interest at stake. The attempted foreclosure sales would have permanently deprived the Plaintiff of her ownership, possession, and use of the Property, which she uses as her primary residence; clouds the title to the Property; impairs her ability to sell, rent, or otherwise alienate the Property; taints her credit rating; reduces the chance of her obtaining a future loan or mortgage; subjects her to eviction; and jeopardizes her security in a dwelling place.

80.     The actions by Wells Fargo and Freddie Mac and FHFA all caused costs to be incurred to the Plaintiff's mortgage loan account, which added to the costs of any modifications under the Freddie Mac modification guidelines.

81.     There is a significant risk of an erroneous deprivation of the Plaintiff's interest through the procedures used by Freddie Mac, and FHFA pursuant to RI General Laws chapter 34-27. To prevent an erroneous deprivation of property, the Due Process Clause of the Fifth Amendment to the United States Constitution requires Freddie Mac, and FHFA to provide Plaintiff with an opportunity to be heard at a meaningful time on, *inter alia,* any challenge to the true ownership of the Note; any challenge to Freddie Mac's and/or FHFA's authority to foreclose on behalf of the owner of the Note; any challenge to Freddie Mac's and/or FHFA's determination of default under the Note and Freddie Mac's and/or FHFA's calculation of deficiency; any challenge to Freddie Mac's and/or FHFA's determination that the Plaintiff is not eligible for a loan modification, a repayment, or other homeowner assistance option; the opportunity to refinance or reinstate through other sources of funding; whether Freddie Mac and/or FHFA acted in good faith; and any challenge to Freddie Mac's and/or FHFA's compliance with applicable notice procedures.

82.   The government's financial interest in obtaining ownership, possession, and use of the Property is minimal.

83.   There are no exigent circumstances that would justify the lack of a pre-deprivation hearing, nor would a meaningful hearing before a neutral party impose significant fiscal or administrative burdens.

84.   FHFA's foreclosure policy in the SAI violates the Due Process Clause of the Fifth Amendment in that it requires servicers of Freddie Mac loans to deprive homeowners like the Plaintiff of their primary residence through the use of non-judicial foreclosure proceedings which do not provide for a hearing prior to the deprivation of the homeowners' property interest.

85.   Freddie Mac, and FHFA jointly violated the Plaintiff's Fifth Amendment procedural due process rights by seeking to conduct several  non-judicial foreclosure sales pursuant to Rhode Island General Laws Chapter 34-27 without first providing adequate notice, a meaningful hearing prior to the deprivation of property, and an opportunity to recover adequate damages.

86.   As a direct and proximate result of Wells Fargo's  Freddie Mac's, and FHFA's violation of the Plaintiff's due process rights, the Plaintiff has suffered damages including harm to her credit; costs and expenses of the foreclosure added to her account; a loss of equity in the Property; expenses due to postage, mailing, and long-distance telephone calls; an impairment of her ability to sell, rent, or otherwise alienate the Property; and having her security in a dwelling place jeopardized.

WHEREFORE, The Plaintiff respectfully requests the Court to grant the following relief:

1.   A declaration that the Freddie Mac's and FHFA's policy of using non-judicial

foreclosure process in Rhode Island General Laws Chapter 34-27-4 (b), or any foreclosure process that does not provide for adequate notice, a meaningful evidentiary hearing prior to the deprivation of property, and an opportunity to recover damages, violates the Plaintiff's due process rights under the Fifth Amendment to the Constitution of the United States;

2.   A declaration that the various scheduled foreclosure sales of the Plaintiff's Property  were invalid and void;

3.    Compensatory Damages;

4.    Attorney Fees and Costs; and

5.   Such other and further relief as the court considers appropriate.


LAURA PEREZ
By her Attorney


August 7, 2019                    /s/ John B. Ennis
                                  JOHN B. ENNIS, ESQ. #2135
                                  1200 Reservoir Avenue
                                   Providence, Rhode Island 02920
                                  (401) 943-9230
                                  Jbelaw75@gmail.com


**COUNT II**

**BREACH OF CONTRACT AND BREACH OF COVENANT OF GOOD FAITH AND DEALING BY FEDERAL HOME LOAN MORTGAGE CORPORATION**

87.    Paragraphs 1-86 are incorporated by reference.

88.    Neither Harmon, Wells Fargo nor FHFA mailed the Plaintiff a notice in the form required pursuant to the provisions of paragraph 22 of the mortgage.

21

89.     Before an acceleration of the loan was declared, the Lender or its assignee was required to send Plaintiff a notice to their home address which specified:

      a.      the default;

      b.      the action required to cure the default, stating a date, not less than 30 days from the date the default must be cured;

      c.      that failure to cure the default on or before the date specified in the Notice may result in the acceleration and sale of her home;

      d.      the right to bring a court action to asset the non-existence of a default of Borrower to acceleration and sale.

90.     Paragraph 22 of Plaintiffs' mortgage, which contains conditions for the exercise of the statutory power of sale, reads as follows:

**Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower as provided in Section 15. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by**

**this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

91.    The provisions in paragraph 22 of the mortgage were a condition precedent to the exercise of the power of sale of the mortgage.  There was no compliance with the terms of the mortgage to exercise the statutory power of sale as indicated above. Any alleged attempted exercise of the statutory power of sale to Plaintiff was defective because a default notice and a valid acceleration notice were never sent as required by paragraph 22 of the mortgage.

92.    After  July 18, 2010, Wells Fargo mailed to the Plaintiff a letter dated July 18, 2010, which purported to be a default letter.  A copy is attached as Exhibit D.

93.    This letter did not comply with paragraph 22 of the mortgage for various reasons. This letter did not advise the Plaintiff that she had a right to bring a Court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.

94.    Instead it stated :

If foreclosure is initiated, you have the right to argue that you did keep your promises and agreements under the Mortgage Note and Mortgage and to present any other defenses you may have.

95.    The failure of the Defendants to comply with the terms of the mortgage rendered void any attempt to commence the alleged foreclosure by Statutory Power of Sale, without having the statutory ability to exercise the statutory power of sale.

96.    The statutory power of sale could only be exercised pursuant to the Plaintiff being sent a default letter pursuant to the terms of the mortgage, followed by an acceleration letter,   before a Notice of Sale was mailed pursuant to R.I.G.L.34-27-4.

97.    Freddie Mac, FHFA and Wells Fargo were aware that the form of the purported default notice which was mailed to the Plaintiff was virtually identical to the purported

Default Notice of Wells Fargo which had been invalidated by Judge Finkle of the

Bankruptcy Court for the District of Rhode Island in the case *of In Re: Demers* on June 5,

2014.

98.     Due to this failure to comply with the terms of the mortgage, Freddie Mac was not

contractually authorized to attempt to exercise the statutory power of sale and foreclose

on the Plaintiffs' property at any time.

99.     The actions of the Defendants constituted a breach of contract, resulting in

damages to the Plaintiff, who hired an attorney to commence this case.

100.    Plaintiff's  mortgage loan account has been charged unreasonable fees and

expenses for the prior foreclosure attempts. She suffered emotional damages for

embarrassment and humiliation by the advertising of a number of foreclosure sales of her

home. She took time out from work to discuss the foreclosure attempts with her attorneys

and to submit loss mitigation packages to Wells Fargo to seek a modification of the

mortgage loan.

101.    Her credit rating was damaged due to the four foreclosure notices sent to her by

Freddie Mac. As a result she has lost the ability to obtain credit at reasonable terms.

102.    The conduct of the Defendant in not complying with the terms of the mortgage

was deliberate, willful, wanton and reckless, warranting the imposition of punitive

damages.

WHEREFORE, Plaintiff demands the following relief:

a.      Damages against Freddie Mac and FHFA for failure to comply with the terms of
the mortgage.

b.      Damages against Freddie Mac and FHFA  for legal fees and actual damages
arising from the breach of contract..

c.      Damages against Freddie Mac and FHFA for charging the Plaintiff fees and costs charged to the mortgage loan account arising from the purported foreclosure attempt.

d.      Legal fees from Freddie Mac and FHFA  pursuant to the provisions of  R.I.G.L §9-1-45.

e.      Punitive damages against Freddie Mac and FHFA.

f.      All other just and proper relief.


                                        LAURA PEREZ
                                        By her Attorney

August 7, 2019                          /s/ John B. Ennis
                                        JOHN B. ENNIS, ESQ. #2135
                                        1200 Reservoir Avenue
                                        Cranston, Rhode Island 02920
                                        (401) 943-9230
                                        Jbelaw75@gmail.com

## COUNT III

**BREACH OF CONTRACT AND BREACH OF THE COVENANT OF GOOD FAITH AND DEALING BY WILMINGTON**

103.    Paragraphs 1-102 are incorporated by reference.

104.    This Court has diversity jurisdiction over this Count

105.    On or February 19, 2016 FHFA and Freddie Mac sold Plaintiff's mortgage along with 2716 other loans to Pretium Mortgage Credit Partners I Loan Acquisition, LP and Rushmore Loan Management Services, LLC.

106.    On or after March 15, 2016, Management Services, LLC ("Rushmore") mailed a letter to the Plaintiff advising her that effective February 19, 2016,  there was a new creditor, named Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not individually but as trustee for Pretium Mortgage Acquisition Trust.

107.     Rushmore became the servicer of Plaintiff's mortgage loan on April 5, 2016. Plaintiff's mortgage loan was in arrears when Rushmore began servicing Plaintiff's mortgage loan.

108.     After Rushmore commenced servicing Plaintiff's mortgage loan, no new default notice pursuant to the terms of paragraph 22 of Plaintiff's mortgage was ever prepared or mailed to her.

109.     On or after  August 1, 2016, on behalf of Wilmington and Rushmore, Harmon sent a notice of  foreclosure sale ("Notice") to the Plaintiff. In the Notice, Harmon stated its intention to sell the property described in the Mortgage, on October 10, 2016 at  4:00 PM.

110.     In the Notice, Harmon stated its intention to sell the property described in the mortgage deed.

111.     In conjunction with this Notice of Sale, Harmon, on behalf of Wilmington and Rushmore recorded a Notice of Mortgagee Sale in the Providence Land Records on August 19, 2016 in Book 11483 Page 164.

112.     As alleged previously, neither Wells Fargo nor Freddie Mac nor FHFA nor Wilmington nor Rushmore had mailed the Plaintiff a default letter pursuant to the terms of the mortgage, prior to mailing the Notice of Sale and the recording of the Notice.

113.     Wilmington and Rushmore retained Harmon as its attorney and were aware of the deficiencies in the July 18, 2010 Wells Fargo letter.

114.     Despite this knowledge, it did not mail a new default notice, instead relying on the defective notice.

115.    On or after  November 1, 2016, on behalf of Wilmington and Rushmore, Harmon sent a notice of  foreclosure sale ("Notice") to the Plaintiff. In the Notice, Harmon stated its intention to sell the property described in the Mortgage, on January 6, 2017 at  4:00 PM.

116.    In the Notice, Harmon stated its intention to sell the property described in the mortgage deed.

117.    In conjunction with this Notice of Sale, Harmon, on behalf of Wilmington and Rushmore recorded a Notice of Mortgagee Sale in the Providence Land Records on November 16, 2016  in Book 11563 Page 59.

118.    As alleged previously, neither Wells Fargo nor Freddie Mac nor FHFA nor Wilmington nor Rushmore had mailed the Plaintiff a default letter pursuant to the terms of the mortgage, prior to mailing the Notice of Sale and the recording of the Notice.

119.    Wilmington and Rushmore retained Harmon as its attorney and were aware of the deficiencies in the Wells Fargo Default Notice.

120.    Despite this knowledge, it did not mail a new default notice, instead relying on the defective notice.

121.    On October 11, 2016, this Court issued an opinion in the case of *Martins v. Federal Housing Finance Agency et al.*

122.    This opinion cited the Demers Bankruptcy Court opinion regarding the proper form of a default notice.

123.    Despite knowledge of the defective nature of the default notice, which was a precondition to acceleration and sale, Wilmington and Rushmore authorized Harmon to mail this Notice of Sale.

124.    On or after  February 1, 2017, on behalf of Wilmington and Rushmore, Harmon sent a notice of  foreclosure sale ("Notice") to the Plaintiff. In the Notice, Harmon stated its intention to sell the property described in the Mortgage, on April 10, 2017 at  5:00 PM.

125.    In the Notice, Harmon stated its intention to sell the property described in the mortgage deed.

126.    In conjunction with this Notice of Sale, Harmon, on behalf of Wilmington and Rushmore recorded a Notice of Mortgagee Sale in the Providence Land Records on February 21, 2017  in Book 11645 Page 307.

127.    As alleged previously, neither Wells Fargo nor Freddie Mac nor FHFA nor Wilmington nor Rushmore had mailed the Plaintiff a default letter pursuant to the terms of the mortgage, prior to mailing the Notice of Sale and the recording of the Notice.

128.    Wilmington and Rushmore retained Harmon as its attorney and were aware of the deficiencies in the Wells Fargo Default Notice.

129.    Despite this knowledge, it did not mail a new default notice, instead relying on the defective notice.

130.    On October 11, 2016, this Court issued an opinion in the case of *Martins v. Federal Housing Finance Agency et al.*

131.    This opinion cited the *Demers* Bankruptcy Court opinion regarding the proper form of a default notice.

132.    Despite knowledge of the defective nature of the default notice, which was a precondition to acceleration and sale, Wilmington and Rushmore authorized Harmon to mail this Notice of Sale.

133.    Before an acceleration of the loan was declared, the Lender or its assignee was

required to send Plaintiff a notice to his home address which specified:

        a.      the default;

        b.      the action required to cure the default, stating a date, not less than 30 days
from the date the default must be cured;

        c.      that failure to cure the default on or before the date specified in the Notice
may result in the acceleration and sale of our home

        d.      the right to bring a court action to asset the non-existence of a default of
Borrower to acceleration and sale.

134.    Due to this failure to comply with the terms of the mortgage, Wilmington was not

contractually authorized to exercise the statutory power of sale and foreclose on the

Plaintiff's property at any time.

135.    Despite possessing the actual knowledge that a valid default notice had not been

transmitted to the Plaintiff, pursuant to the terms of the mortgage and the Judicial

interpretation in  the *Demers* opinion and the *Martin* opinion,  Wilmington decided to go

forward with a purported foreclosure sale on May 3, 2017.

136.    On May 3, 2017 Wilmington purported to exercise the statutory power of sale and

sell the property at a foreclosure sale to itself for 112,500.00.

137.    A copy of the purported Foreclosure Deed is attached as Exhibit E, recorded in

the Land Evidence Records of the City of Providence in Book 11767 Page 170 on July

10, 2017  at 12:00 PM.

138.    Wilmington was aware of the *Martins* decision, which required strict compliance

with the terms of the mortgage and particularly requiring a notice of the right to bring a

Court action as provided in paragraph 22.

139.    In fact the purported foreclosure deed contains a purported Affidavit of Compliance with Condition Precedent to Acceleration and Sale.

140.    This purported affidavit was dated June 30, 2017 and falsely asserted without attaching the purported default notice that:

Notice of Default to Mortgagor has/have been given prior to acceleration by the then holder of the note secured by said mortgage or its duly authorized agent in strict compliance with the notice requirements set forth in the mortgage.

141.    This document was prepared by Harmon Law Offices, as indicated on the bottom of each of the two pages, which states:

/HLO Martins affidavit/Perez, Laura / Silvestre, Dominga.

142.    This word processed form was sent to Rushmore by Harmon to sign.

143.    As indicated previously, the purported default notice did not contain the proper language regarding the right to bring a Court action.

144.    However neither Harmon nor Rushmore nor Wilmington cared about the content of the notice.

145.    Rather a false affidavit attesting to the "Martins Sufficient" nature of the default notice was prepared.

146.    This affidavit was prepared and signed to satisfy any title company about the default notice, despite the fact that the assertions in the affidavit were false.

147.    After the foreclosure deed was recorded, Wilmington hired a new law firm to represent it, specifically Orlans P.C.

148.    This law firm filed an action against the Plaintiff and her mother in the 6th Division District Court of the State of Rhode Island in case no. 6CA-2011-9629 on September 11, 2017.

149.    Plaintiff's attorney entered his appearance in this case and advised the attorney for Wilmington an Rushmore of the deficiency of the default notice , attaching a copy of the notice.

150.    Wilmington, through its attorney was thus again made aware of the defective nature of the default notice.

151.    The eviction case is currently pending in the Superior Court, in case number PD-2019-1115, with Plaintiff paying use and occupancy of $1000.00 per month, effective March 1, 2019 to the Registry of the Superior Court, without prejudice to the issues in this case.

152.    The actions of the Defendants constituted a breach of contract, resulting in damages to the Plaintiff, who hired an attorney to commence this case.

153.    Plaintiff's mortgage loan account has been charged unreasonable fees and expenses for the prior two foreclosure attempt and for this attempt to foreclose.

154.    She has suffered emotional damages for embarrassment and humiliation by the advertising of a foreclosure of her home and an eviction action by Wilmington.

155.    The conduct of Wilmington in not complying with the terms of the mortgage were deliberate, willful,  wanton and reckless, warranting the imposition of punitive damages.

156.    Plaintiff  has incurred legal fees for the defense of the eviction action and for the prosecution of this action.


WHEREFORE, Plaintiff demands the following relief:

a.      Damages against Wilmington for failure to comply with the terms of the mortgage and for foreclosing and seeking to evict the Plaintiff.

b.      Damages against Wilmington for legal fees and actual damages arising from the breach of contract..

c.      Damages against Wilmington for charging the Plaintiff fees and costs charged to the mortgage loan account arising from the purported foreclosure attempts.

d.      Legal fees from  Wilmington  pursuant to the provisions of  R.I.G.L § 9-1-45.

e.      Punitive damages against Wilmington.

f.      All other just and proper relief.


                                LAURA PEREZ
                                By her Attorney

August 7, 2019                  /s/ John B. Ennis_____
                                JOHN B. ENNIS, ESQ. #2135
                                1200 Reservoir Avenue
                                Cranston, Rhode Island 02920
                                (401) 943-9230
                                Jbelaw75@gmail.com


                            **COUNT IV**

                    **DECLARATORY JUDGMENT**

157.    Paragraphs 1- 56 are incorporated by reference.

158.    This Court has jurisdiction to issue Declaratory Judgments pursuant to the

Declaratory Judgment Act, 28 U.S.C §2201.

159.    The failure of Wilmington to comply with the terms of the mortgage, by virtue of

a valid default notice rendered the purported foreclosure void.

160.    As a result the purported deed recorded in the Land Evidence Records of the City

of Providence in Book 11767 Page 170 on July 10, 2017 at 12:00 PM. should be vacated and rescinded.

161.    This Court has the power to declare that the aforementioned deed to be void and without any effect.

162.    Plaintiff has incurred legal fees for the prosecution of this action.

Wherefore Plaintiff demands the following relief:

a.    A declaration that the foreclosure sale of the Plaintiff's Property on May3, 2017 was invalid and void;

b.    A declaration that the foreclosure deed recorded in the Land Evidence Records of the City of Providence in Book 11767 Page 170 on July 10, 2017 at 12:00 PM is invalid and void;

c.    Grant all other just and proper relief.


                                        LAURA PEREZ

                                        By her Attorney

August 7, 2019                          /s/ John B. Ennis
                                        JOHN B. ENNIS, ESQ. #2135
                                        1200 Reservoir Avenue
                                        Cranston, RI 02920
                                        (401) 943-9230
                                        Jbelaw75@gmail.com


Plaintiff demand a Trial by Jury on all Claims Triable by a Jury

33